[994 NYS2d 251]

LINETTE COOPER, Petitioner, v BACK ON TRACK GROUP, INC., Respondent.

Civil Court of the City of New York, Kings County, July 25, 2014

### APPEARANCES OF COUNSEL

*Wenig Saltiel LLP*, Brooklyn, for respondent.
*MFY Legal Services, Inc.*, New York City, for petitioner.

### OPINION OF THE COURT

LAURIE L. LAU, J.

After a digitally-recorded trial held on July 15, 2014 (FTR 507) and after due deliberation and consideration of the credible documentary and testimonial evidence adduced at the trial, the court makes the findings of fact and conclusions of law set forth below.

Linette Cooper commenced this proceeding by order to show cause in lieu of petition against Back on Track Group, Inc. (BOT), seeking to be restored to possession of the premises known as 2nd floor, 1st room on the right, bottom bunk on the left side (the premises) in the building known as 694 New Lots Ave. Brooklyn (the building) alleging her illegal lockout from the premises by BOT.

Respondent defends against this proceeding alleging, inter alia, that it was not prohibited from utilizing self-help in removing the petitioner from the premises inasmuch as she breached her occupancy agreement for the premises and is a mere licensee not protected from extrajudicial ouster.

Both sides, represented by counsel, stipulated to the following facts:

1. Petitioner had resided in the premises since April 2014;

2. On July 11, 2014, petitioner was excluded from the premises in the presence of the New York City Police Department following a conversation between BOT and the Police; and

3. BOT discharged petitioner from its program effective July 11, 2014.

BOT purports to provide qualified adults with support services, counseling, and temporary housing as part of a comprehensive program. BOT offers program participants beds in an apartment or private house which they occupy in close quarters with other participants in the program. The houses are allegedly supervised by various managers. Some managers are offi-

cers or employees of BOT and some are other participants in the program. The building in question is what is commonly referred to as a "three-quarter house."

Petitioner Linette Cooper testified. She testified that prior to her coming to BOT she spent four to five months homeless in Jersey City, New Jersey. After a short stay in Woodhull Hospital, petitioner found her way to BOT in April 2014. Petitioner testified that she initially thought that BOT sounded like a good place for her to find temporary support and housing. Upon viewing the building and premises however, she described what she saw as "chaos." Her disappointment with the premises notwithstanding, petitioner accepted the conditions because she "had nowhere else to go."

Petitioner further testified that prior to her moving into the premises she went to respondent's office in Queens to sign a 17-page agreement to participate in BOT programs and occupy the premises (the license agreement). Petitioner stated that she did not read the license agreement before executing it because she did not have glasses and the print appeared very small to her. She further testified that two employees of BOT explained the basic terms of the license agreement to her, to wit, that petitioner would participate in the program and that BOT would help her secure housing. She testified that the manner in which she might be removed from that housing was never discussed. Petitioner moved into the premises in April 2014.

Petitioner testified that she considered "Mr. Yury" her landlord while she was residing in the premises. She stated that he collected rent and monitored her activities. Petitioner produced certified copies of Department of Social Services (DSS) checks payable to BOT, on her behalf, in the amount of $215 per month for the months of April 2014 through the first half of July 2014.

As to the date of her alleged discharge from BOT and removal from the premises, petitioner testified that she was first told that she had to leave the premises on Friday, July 11, 2014 at 6:00 a.m. by "Mr. Yury." After a brief discussion, petitioner called the Police. Petitioner testified that she was already outside of the building when the Police came to the building and had discussions with BOT staff. She testified that the Police told her she had to leave. Shortly thereafter petitioner left the building, continued to the courthouse and commenced the instant proceeding.

Respondent called Yury Baublit to testify. Mr. Baublit testified that he is an officer of BOT and the manager of the building

which he referred to as a "program house." Mr. Baublit stated that the building was one of 12 "program houses" operated by BOT. Mr. Baublit testified that the building is owned by his wife.

Respondent next called Lisa Short to testify. Ms. Short testified that she was hired as a client/house manager for the building by "Yury." The witness stated that as the house manager she was in charge of taking the residents' attendance, ensuring their participation in "groups" and was responsible for assigning the female participants their beds.

Ms. Short testified that she knew the petitioner as a client of BOT and that she was present when petitioner was discharged from the program. She testified that petitioner's belongings were packed up and put downstairs in the building by 3:00 a.m. on Friday, July 11, 2014. Ms. Short recalled that petitioner refused to leave and called the Police. After the Police arrived at the building and spoke with several employees of BOT, they informed the petitioner she had to leave the premises.

Respondent's final witness was Edwin Elie. Mr. Elie testified that he is a program director for BOT and that the petitioner was a participant in the BOT program until she was discharged on July 11, 2014. Mr. Elie recalled a conversation with the petitioner on Monday, July 7, 2014 when she was informed that she had to leave the premises. Mr. Elie testified that he saw petitioner packing her belongings on Thursday, July 10, 2014 and that he witnessed her leave the building after the Police arrived on the scene on Friday, July 11, 2014.

RPAPL 711 provides in pertinent part:

> "A tenant shall include an occupant of one or more rooms in a rooming house or a resident, not including a transient occupant, of one or more rooms in a hotel who has been in possession for thirty consecutive days or longer; he shall not be removed from possession except in a special proceeding."

Administrative Code of the City of New York § 26-521, titled "Unlawful eviction," provides in pertinent part:

> "a. It shall be unlawful for any person to evict or attempt to evict an occupant of a dwelling unit who has lawfully occupied the dwelling unit for thirty consecutive days or longer or who has entered into a lease with respect to such dwelling unit or has made a request for a lease for such dwelling unit pursuant to the hotel stabilization provisions of the

rent stabilization law except to the extent permitted by law pursuant to a warrant of eviction or other order of a court of competent jurisdiction or a governmental vacate order by:

"(1) using or threatening the use of force to induce the occupant to vacate the dwelling unit; or

"(2) engaging in a course of conduct which interferes with or is intended to interfere with or disturb the comfort, repose, peace or quiet of such occupant in the use or occupancy of the dwelling unit, to induce the occupant to vacate the dwelling unit including, but not limited to, the interruption or discontinuance of essential services; or

"(3) engaging or threatening to engage in any other conduct which prevents or is intended to prevent such occupant from the lawful occupancy of such dwelling unit or to induce the occupant to vacate the dwelling unit including, but not limited to, removing the occupant's possessions from the dwelling unit, removing the door at the entrance to the dwelling unit; removing, plugging or otherwise rendering the lock on such entrance door inoperable; or changing the lock on such entrance door without supplying the occupant with a key.

"b. It shall be unlawful for an owner of a dwelling unit to fail to take all reasonable and necessary action to restore to occupancy an occupant of a dwelling unit who either vacates, has been removed from or is otherwise prevented from occupying a dwelling unit as the result of any of the acts or omissions prescribed in subdivision a of this section and to provide to such occupant a dwelling unit within such dwelling suitable for occupancy, after being requested to do so by such occupant or the representative of such occupant, if such owner either committed such unlawful acts or omissions, or if such acts or omissions occurred within seven days prior to such request."

The court finds BOT's argument that licensees housed at BOT are exempt from statutory protections and may be subject to extrajudicial eviction unpersuasive and not grounded in fact or law. There exists no law exempting BOT from the requirement to afford petitioner and, indeed, other occupants of BOT's bunk beds, due process of law. BOT's matter-of-fact and conclusory assertions and carefully, if inartfully, chosen words in categorizing the relationship between BOT and the occupants of

their "program houses" as "participants" rather than tenants or even licensees, do not render them valid or effective in the eyes of the court.

The court finds that BOT's assertion that petitioner effectively waived her rights pursuant to the RPAPL and Administrative Code similarly without merit.

Respondent specifically relies on the provisions in the license agreement to support its contention that petitioner's eviction from the premises was proper.

A provision titled **Waiver of Participant Rights** provides as follows:

> "This Waiver of Rights is in addition to the rules and regulations of **Back on Track Group, Inc** and is between this individual who is applying to be a client/participant of the **Back on Track Group, Inc** house (herein referred to as **'Participant'**) and **Back on Track Group, Inc** (referred to as 'Program').

> "The undersigned **'Participant'** understands and fully agrees to the following: The **'Participant'** is/or will be after a 30 day probation period, an approved participant of an institution/program/3/4 house known as **Back on Track Group, Inc**. This housing is part and parcel of the **'Participant'** overall plan to lead a sober and meaningful life.

> "At the 'program' the **'Participant' is not a tenant of a room/apartment/hotel/dwelling, i.e. al.,** but is in fact a **'Participant'** of sober/Recovery/facility/Institution and as such is therefore **excluded from Landlord-Tenants Rights and Landlord-Tenant law** as per uniform Landlord-Tenant Act: Set part II, sec 1.202 (1) resident [at] an institution. Therefore the **'Participant,'** must leave as asked per the rules and regulations of the 'program.'

> "As a **'Participant'** of the 'program', the **'Participant'** will comply, and abide with all the rules and regulations of the 'program', a copy of these rules will be signed by the **'Participant'** and attached to this rider.

> "If the **'Participant'** fails to comply with the rules of the 'program' the **'Participant'** may and can be removed from the 'program'. If dismissed/discharged from the 'program' the **'Participant'** will have to vacate the premises of the said 'program' within 24

hours. The **'Participant'** will also be required to go [to] another 3/4 house or shelter. If the discharge/removal of the **'Participant'** is due to the **'Participant'** being under the influence of alcohol or drugs or for violence or threats of violence and/or is a danger to other **Participants**, th[en] the **'Participant'** her[eby] agrees to leave immediately to a shelter.

"By the **'Participant'** signing below along with a witness it is agreed that the **'Participant'** is aware of and in agreement [of] this 'Waiver of Rights.' "

Another provision of the license agreement titled Facility Codes provides as follows:

"I understand that I am living in a Temporary Shelter. This is not my permanent residence. I agree to abide by the following rules. I also understand that it is an immediate discharge for fighting, using alcohol or drugs or not coming home.

"1) I agree to an 11:00 pm curfew Monday to Thursday and a 1:00 am curfew Friday and Saturday, and a 9:00 pm curfew on Sunday.

"2) IF Back on Track, Inc. FINDS THE NEED TO TRANSFER YOU THE CLIENT TO ANOTHER Facility, WE HAVE THE RIGHT TO DO SO!!!!!

"3) I understand I need to get approval from the Facility manger to have an overnight pass on Friday and Saturday nights.

"4) I understand I need to make arrangements with the facility manager if I have a work schedule that will interfere with my curfew.

"5) I understand that this is a sober facility and any use of alcohol or drugs will not be tolerated.

"6) I understand that if I am found to be using AOD I may be referred to a higher level of care and I will have my bed when I return.

"7) I agree to do my daily chore as assigned.

"8) I agree to avoid any violence or threats and this may end up in my being asked to leave the sober facility.

"9) I also agree not to touch the personal property of others.

"10) I understand there is no smoking in this facility and I will be asked to leave if I am found smoking.

"11) I agree to take random urine and/or Breatha-lyzer tests when asked.

"12) If applicable I agree to attend outpatient services. I also understand that failure to attend outpatient services will result in my being discharged.

"13) I understand that the facility house is closed from 10am-2pm Monday-Friday.

"14) <u>Back on Track group,</u> Program stay is 6-9 months after completion of program you must find other housing.

"15) There are <u>No visitors</u> allowed in the facility!!!! No exceptions!!!!!

"****<u>There is no hanging out/smoking in front of the building or on the</u>****

"****<u>Front porch if you get caught by the staff you will be discharged</u>****"

A plain reading of these two pages of the 17-page license agreement reveals terms that are, at best, formidable and oppressive. The language and nature of the license agreement coupled with petitioner's credible testimony regarding the facts and circumstances surrounding her executing same lead the court to find that said license agreement, as an unconscionable contract of adhesion, is unenforceable as a waiver of the statutory protections afforded the petitioner by the RPAPL and the Administrative Code. (*McCormick v Resurrection Homes*, 38 Misc 3d 847 [Civ Ct, Kings County 2012]; *Davidson v House of Hope*, NYLJ, Nov. 28, 2012 [Civ Ct, Kings County 2012].)

It is undisputed that the petitioner resided in the premises in excess of 30 days, from April 2014 through approximately 6:00 a.m. on July 11, 2014. The evidence establishes that DSS paid BOT $215 per month, an individual shelter allowance, for the months that petitioner occupied the premises. It is further undisputed that BOT had the petitioner removed and/or excluded from the premises on July 11, 2014 without a court order or resort to legal process, and that the petitioner remains out of possession to date.

Accordingly, respondent's motion to dismiss is denied. The court finds that the petitioner, Linette Cooper, is entitled to possession of the premises. Respondent is ordered to provide the petitioner, forthwith, immediate access to the building and the premises. The damages portion of this proceeding is severed for a plenary action.

Petitioner is awarded a final judgment of possession against respondent BOT as well as "John and Jane Doe" with the appropriate warrants sufficient to restore petitioner to possession to issue and execute forthwith.